UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION

UNITED STATES OF AMERICA,          )
                                   )
                Plaintiff,         )
                                   )
        v.                         )        No. 4:07 CR 240 RWS
                                   )                          DDN
CURTIS ARTHUR and                  )
DENISE BOYCE, et al.,              )
                                   )
                Defendants.        )

## ORDER AND RECOMMENDATION
## OF UNITED STATES MAGISTRATE JUDGE

This action is before the Court upon the pretrial motions of the parties which were referred to the undersigned United States Magistrate Judge pursuant to 28 U.S.C. § 636(b).  An evidentiary hearing was held on June 15, 2007.

## Motions to suppress evidence

Defendant Curtis Arthur has moved to suppress evidence (oral motion Doc. 21), to suppress evidence and statements (Doc. 82), and to suppress the fruits of illegal electronic and other surveillance (Doc. 83).

Defendant Denise Boyce has moved to suppress evidence (oral motion Doc. 52), to suppress evidence and statements (Doc. 79), and to suppress the contents of any electronic surveillance (Doc. 80).

The government has orally moved for a hearing on the suppression issues (Docs. 22 and 53).

From the evidence adduced at the hearing, the undersigned makes the following findings of fact and conclusions of law:

## FACTS

1.    Between September 2004 and the late fall of 2005, Maryland Heights, Missouri, Police Officer Matthew Delia, detached to the Drug Enforcement Administration (DEA) as a federal Task Force Agent, participated in the investigation of defendants Curtis Arthur, Denise Boyce, and others.  The DEA had learned from one or more confidential sources, including Gerald Watkins, that Boyce was distributing ounce-

sized quantities of heroin in the St. Louis area. Later, in its investigation, the DEA learned of the involvement of Curtis Arthur in the drug trafficking.

2. After his arrest, Watkins agreed to work with the police. With his cooperation, the police arranged for meetings between Watkins and Boyce. These meetings involved the purchases of ounce quantities of heroin from Boyce. These ounce buys did not, however, yield either Boyce's source or Boyce's co-conspirators--two primary goals of the DEA's investigation. Following these transactions, and before later authorized wiretapping, law enforcement used electronic and other sources of information. Gov. Exs. A, B, C, D.

## Orders for Pen Registers, Trap and Trace Devices,
## § 2703(c) and (d) Disclosure

### 314-440-2523

3. On January 11, 2005, the United States Attorney applied for and received an order from Magistrate Judge Audrey G. Fleissig, authorizing the installation of pen register and trap and trace devices, including caller identification on cell phone number 314-440-2523, subscribed by Denise Boyce. The application certified that the government was investigating Boyce for narcotics distribution. See Gov. Ex. D-5. On March 10, 2005, an application for an extension of the use of those devices on that telephone number was filed by the government and ordered by the undersigned Magistrate Judge. Id. at D-6.

### 314-420-6798

4. a. On February 2, 2005, the United States Attorney applied for and received an order from Magistrate Judge Frederick R. Buckles, authorizing the installation of pen register and trap and trace devices, including caller identification, on cell phone number 314-420-6798. The application certified that the government was investigating Curtis Arthur and others for federal drug law violations. See Gov. Ex. D-1.

b. Also on February 2, 2005, the United States Attorney applied for and received an order from Judge Buckles under 18 U.S.C. §

2703(c) and (d) authorizing the disclosure of telecommunications records, including cell site activation data, for this telephone number. The application demonstrated with specific and articulable facts that there were reasonable grounds for believing that the records sought were relevant and material to an ongoing criminal investigation. The application described the investigation of Denise Boyce which included three purchases of black tar heroin through a confidential informant and the use of the subject phone to call Boyce's cell phone in connection with the sales. Id. at D-2.

 c. On March 31, 2005, the government filed an application for an extension of the use of the pen register and enhanced caller identification devices for the -6798 cell phone. On that date, the application was sustained and the appropriate order issued by Magistrate Judge Thomas C. Mummert. Id. at D-3.

 d. Also on March 31, 2005, the United States Attorney applied for and received an order from Judge Mummert authorizing the disclosure of telecommunications records, including cell site activation data, for this telephone. The application demonstrated with specific and articulable facts that there were reasonable grounds for believing that the records sought were relevant and material to an ongoing criminal investigation. The application described the investigation of the drug trafficking activities of Curtis Arthur, Denise Boyce, and others, and the use of the subject telephone in those activities. Id. at D-4.

314-440-2523

 5. On January 11, 2005, the United States Attorney applied for and received an order from Magistrate Judge Fleissig authorizing the installation of pen register and trap and trace devices, including caller identification, on cell phone number 314-440-2523. The application certified that the government was investigating Denise Boyce for narcotics distribution. See Gov. Ex. D-5. On March 10, 2005, an application for an extension of the use of those devices on that telephone number was filed by the government and ordered by the undersigned Magistrate Judge. Id. at D-6.

- 3 -

## Title III Wiretap Orders
### 314-440-2523

6.    a.    On February 15, 2005, the United States Attorney for this district, pursuant to 18 U.S.C. § 2518,[1] filed an application for an order authorizing the interception of wire communications to and from a cellular telephone being used by Denise Boyce, Curtis Arthur, and others named, bearing telephone number 314-440-2523, referred to as Target Telephone (TT) #1.  The application sought a wiretap order for the monitoring of the telephone conversations of Arthur, Boyce, and others in the government's investigation of the subjects' trafficking in cocaine and heroin and their money laundering.  The application stated, in part, that normal investigative procedures had been tried and failed, reasonably appeared unlikely to succeed if tried, or were too dangerous to employ.  See Gov. Ex. A-1.

b.    In his sworn affidavit, dated February 15, 2005, submitted in support of the application, Task Force Agent Matthew Delia described his extensive training and experience in investigating the illegal trafficking in narcotics, and he set forth his expert opinions about the manner in which large-scale drug traffickers operate.  He identified and described the backgrounds of the subjects of the investigation, and he described facts uncovered by the investigation to demonstrate that probable cause existed for the issuance of the order. The affidavit described the objectives of the investigation to include the identification of the persons involved in the drug trafficking, the times and locations of the drug distributions, the communications facilities used in the criminal activity, the times and locations of the importation of controlled substances into the United States and this district, and the subjects' activities in money laundering of the proceeds of the illegal drug activity.  The affidavit described the information learned through the use of two confidential sources (CS#1 and CS#2), several controlled purchases of heroin from Denise Boyce during January and February 2005, pen register activity of TT#1, and the

---

[1]Title III of the Omnibus Crime Control and Safe Streets Act of 1968, 18 U.S.C. §§ 2510-2520.

recording of at least one telephone conversation with Boyce about drug trafficking. The affidavit included information about the investigators' physical surveillance of Boyce which proved not to be productive. The affidavit described the data learned through the operation of the pen register on TT#1. Gov. Ex. A-2.

c.    The affidavit also described the need for the wiretap authorization. The affidavit stated that other investigative techniques have been used and either failed completely, had some, but limited, success in achieving all the objectives of the investigation which are described above, reasonably appear to be unlikely to succeed if tried, or are too dangerous to employ. The affidavit described the investigators' use of physical surveillance, search warrants, confidential sources and informants, interviews with witnesses and the use of the grand jury process, trash seizures, pen register devices, trap and trace devices, toll records, and undercover agents. More specifically, the affidavit indicated that the use of physical surveillance alone did not provide probable cause for search warrants, did not disclose many aspects of how the drug traffickers operated, and on several occasions the traffickers saw the police on surveillance. Because large scale drug traffickers break down large shipments into much smaller amounts for distribution and disburse the smaller amounts, the use of search warrants is limited to the isolated subjects of the warrant and would alert the traffickers so that they could destroy other evidence. The efficacy of confidential sources was limited by the traffickers not giving the confidential sources full information about the trafficking operation. Interviews with witnesses and the use of grand jury subpoenas are limited in their usefulness because such witnesses are often related by blood to and are loyal to the subjects of the investigation. Undercover agents are generally not able to rise in importance in the trafficking organization higher than that of the confidential sources. Trash seizures provide very limited information and do not indicate the overall goals and leaders of the drug operation and other characteristics of the traffickers. Pen registers, trap and trace devices, and the acquisition of toll records disclose useful information but do not provide the full scope of the operation. Id.

d.    The affidavit described the manner by which the wiretap monitoring would be minimized as required by statute.    Id.

e.    Upon this affidavit, on February 15, 2005, District Judge Catherine D. Perry issued her order authorizing the interception of communications over cell phone number 314-440-2523.  Her order stated her findings of probable cause to believe that the communications of the identified subjects would be obtained by implementation of the order, that normal investigative procedures have been tried and have failed, reasonably appear to be unlikely to succeed if tried, or are too dangerous to employ, and that TT #1 will continue to be used in connection with the commission of the described offenses under investigation.  The order also required the minimization of the monitored communications to those that relate to the subject investigation.    Id. at A-3.

f.    Furthermore, on February 15, 2005, Assistant United States Attorney Tiffany G. Becker issued a letter to the investigating agents stating the agents' specific requirements for knowing the contents of the court orders authorizing the wiretapping, executing the orders as soon as practicable, recording the intercepted conversations, monitoring and minimizing procedures, protecting the recordings of conversations from alterations, duplicating the original disks of pertinent conversations, daily reporting on the investigation activities, interception of legally privileged communications, intercepting communications regarding other crimes, keeping an accurate log of wiretapping activities, keeping the intercepted communications confidential to those legally authorized to have access, terminating the wiretapping when the objectives have been accomplished, preparing transcripts of the conversations, and each investigating agent reviewing her letter.  Id. at A-4.

g.    As required by statute and by Judge Perry's order, the government filed two written ten-day reports on the progress the investigation was making toward achieving its objectives and the need for continued interception.  The first reported that, among other facts, 286 calls were intercepted and that 21 calls were minimized.  The second

report stated that 489 calls were intercepted and that 39 were minimized. Id. at A-5, A-6.

        h.    On March 17, 2005, pursuant to the application of the United States and a new affidavit of Agent Delia, District Judge E. Richard Webber issued an order authorizing the continued interception of communications over cell phone number 314-440-2523. Gov. Exs. A-7, A-8, A-9. Thereafter, four more ten-day reports were filed by the government regarding the wiretap on that phone. The first reported that 436 calls were intercepted and that 30 were minimized. The second reported that 660 calls were intercepted and that 37 were minimized. The third report indicated that 406 calls were intercepted and that 30 were minimized. The fourth report indicated that 326 calls were intercepted and that 31 were minimized. Gov. Exs. A-10, A-11, A-12, and A-13. On April 18, 2005, pursuant to the application of the United States, Judge Webber ordered the sealing of the Magneto Optical disk that contained the communications intercepted over the subject telephone. Id. at A-14, A-15.

314-420-6798

    7.    a.    On March 9, 2005, the United States, pursuant to 18 U.S.C. § 2518, filed an application for the interception of communications to and from the cellular telephone being used by Curtis Arthur, Denise Boyce, and others named, including Linda Taylor, bearing telephone number 314-420-6798, referred to as Target Telephone #2. The application stated, in part, that normal investigative procedures had been tried and failed, reasonably appeared unlikely to succeed if tried, or were too dangerous to employ. See Gov. Ex. B-1.

        b.    In his sworn affidavit, dated March 9, 2005, submitted in support of the application, Agent Delia identified and described the backgrounds of the subjects of the investigation and described facts uncovered by the investigation to demonstrate that probable cause existed for the issuance of the order.[2] The affidavit described the federal

_____

[2]The affidavit incorporated by reference the affidavit filed by Agent Delia in support of a wiretap order for Target Telephone #1 on
(continued...)

investigation of the heroin[3] trafficking activities of Curtis Arthur, Denise Boyce, and others. The affidavit proffered descriptions of wiretap-monitored conversations among the subjects of the investigation. The objectives of the investigation were the same as before, except that the investigation focused on sources of supply in Texas. This affidavit provided the same kinds of information provided in the affidavit described in Finding 6, above, plus information learned since then in the investigation. Id. Ex. B-2.

        c. The affidavit also described the need for the wiretap authorization. The affidavit stated that the use of other investigative techniques have been used and, with their inherent limitations, either failed completely, had only limited success in achieving all the objectives of the investigation which are described above, reasonably appear to be unlikely to succeed if tried, or are too dangerous to employ. The affidavit described the investigators' use of physical surveillance, search warrants, confidential sources and informants, interviews with witnesses and the use of the grand jury process, Title III intercepted information, mobile tracking devices, trash seizures, pen register devices, trap and trace devices, toll records, and undercover agents. More specifically, as in the earlier affidavit, the affidavit indicated that the use of physical surveillance alone did not provide probable cause for search warrants, did not disclose many aspects of how the drug traffickers operated, and on several occasions the traffickers took precautions to avoid being detected or followed by police on surveillance. Because the use of search warrants is limited to the isolated subjects of the warrant, they would provide only limited information, and would alert the traffickers so that they could destroy evidence located in other places. The agent gave his opinion that the efficacy of confidential sources has been exhausted. Interviews with witnesses and the use of grand jury subpoenas are limited in their

---

[2](...continued)
February 15, 2005. Gov. Ex. B-2 at 6.

[3]This affidavit did not include cocaine as a controlled substance involved in this investigation.

usefulness because such witnesses are often related by blood to and are loyal to the subjects of the investigation, and such techniques would alert the subjects to the existence of the investigation. Undercover agents are generally not able to rise in importance in the trafficking organization higher than that of the confidential sources; Agent Delia gave his opinion that the use of undercover agents has been exhausted in this investigation. Trash seizures provide very limited information and do not indicate the overall goals and leaders of the drug operation and other characteristics of the traffickers. Pen registers, trap and trace devices, and the acquisition of toll records provide useful information but do not provide the full scope of the operation. Id.

d.    The affidavit described the manner by which the wiretap monitoring would be minimized as required by statute. Id.

e.    Upon this affidavit, on March 9, 2005, District Judge E. Richard Webber issued his order authorizing the interception of communications over cell phone number 314-420-6798. His order stated his findings of probable cause to believe that the communications of the identified subjects would be obtained by implementation of the order; that normal investigative procedures have been tried and have failed, reasonably appear to be unlikely to succeed if tried, or are too dangerous to employ; and that TT#2 will continue to be used in connection with the commission of the described offenses under investigation. The order also required minimization of the monitored communications to those that relate to the subject investigation. Id. at B-3.

f.    On March 9, 2005, Assistant United States Attorney Tiffany Becker issued a letter to the investigating agents, similar to that described in Finding 6(f) above, prescribing the guidelines for conducting the wiretapping authorized by Judge Webber, including minimization. Id. at B-4.

g.    As required by statute and by Judge Webber's order, the government filed three written ten-day reports on the progress the investigation was making toward achieving its objectives and the need for continued interception. The first report stated, among other things, that 701 telephone calls were intercepted and 54 calls were minimized. The second report stated that 842 calls were intercepted and 66 were

minimized.  The third report stated that 833 calls were intercepted and 96 were minimized.  Id. at B-5, B-6, B-7.

       h.    On April 11, 2005, pursuant to the application of the United States, District Judge Catherine D. Perry ordered the sealing of an electronic disk that contained the monitored and recorded conversations over TT#2.  Id. at B-8, B-9.

       i.    On April 12, 2005, pursuant to the application of the United States and a new affidavit of Agent Delia, District Judge Rodney W. Sippel issued an order authorizing the continued interception of communications over cell phone number 314-420-6798.  Id. at B-10, B-11, B-12.  Thereafter, two more ten-day reports were filed by the government regarding the wiretap on that phone.  The first report stated, among other facts, that 702 calls were intercepted and 86 calls were minimized. The last report stated that 533 calls were intercepted and that 46 calls were minimized.  Id. at B-13, B-14.

       j.    On May 3, 2005, pursuant to the application of the United States, Judge Perry ordered the sealing of the Magneto Optical disk that contained the communications intercepted over TT#2.  Id. at B-15, B-16.

314-853-3413 and
314-381-4505

    8.    a.    On May 2, 2005, the United States, pursuant to 18 U.S.C. § 2518, filed an application for an order authorizing the interception of communications to and from a cellular telephone (having number 314-853-3413)(TT#3) and a residential telephone (having number 314-381-4505) (TT#4) being used by Denise Boyce and others named.  The stated purposes of the requested authorization to wiretap included the investigation of the named people for violating federal drug laws, unlawful use of communications facilities, a continuing criminal enterprise, and money laundering.  The application stated, in part, that normal investigative procedures had been tried and failed, reasonably appeared unlikely to succeed if tried, or were too dangerous to employ.  See Gov. Ex. C-1.

       b.    In his sworn affidavit, dated May 2, 2005, submitted in support of the application, Agent Delia identified and described the backgrounds of the subjects of the investigation and described facts

uncovered by the investigation to demonstrate that probable cause existed for the issuance of the order.  The affidavit stated that the persons under investigation have been members of a drug trafficking organization that obtains heroin and cocaine for distribution in St. Louis.  This affidavit provided the same kinds of information provided in the affidavit described in Finding 6, above, plus information learned since then in the investigation.  It described conversations intercepted earlier in related wiretaps.  The affidavit established that the use of usual non-wiretap investigative techniques, with their inherent limitations, would be unable to fully achieve the objectives of the investigation.  Id. at C-2.

c.    Upon this affidavit, on May 2, 2005, District Judge Henry E. Autrey issued his order authorizing the interception of communications over TT#3 and TT#4.  His order stated his findings of probable cause to believe that the communications of the identified subjects would be obtained by implementation of the order; that normal investigative procedures have been tried and have failed, reasonably appear to be unlikely to succeed if tried, or are too dangerous to employ; and that TT#3 and TT#4 will continue to be used in connection with the commission of the described offenses under investigation.  The order also required the minimization of the communications that are intercepted to those that relate to the subject investigation.  Id. at C-3.

d.    On May 2, 2005, Assistant United States Attorney Tiffany Becker issued a letter to the investigating agents, similar to that described in Finding 6(f) above, prescribing the guidelines for conducting the wiretapping authorized by Judge Autrey, including minimization.  Id. at C-4.

e.    As required by statute and by Judge Autrey's order, the government filed three written ten-day reports on the progress the investigation was making toward achieving its objectives and the need for continued interception.  The first reported that a total of 950 calls were intercepted for both telephone numbers and that a total of 67 calls were minimized.  The second reported a total of 1000 intercepted calls and a total of 73 minimized calls.  The third reported a total of 1150

intercepted calls and a total of 84 calls minimized.  <u>Id.</u> at C-5, C-6, C-7.

f.  On June 1, 2005, pursuant to the application of the United States, Judge Autrey ordered the sealing of an electronic disk that contained the monitored and recorded conversations.  <u>Id.</u> at C-8, C-9.

### April 4, 2005

9.  On April 4, 2005, DEA personnel monitored telephone conversations between Denise Boyce and a woman identified as Linda Taylor. In the telephone calls Taylor negotiated to buy an ounce of black tar heroin from Boyce for $1,400 so she could resell it.  Also on April 4, 2005, the DEA intercepted and monitored telephone calls and conversations between Boyce and Curtis Arthur.  Boyce called Arthur to negotiate a purchase of an ounce of black tar heroin from him.[4]  Arthur agreed to sell it to her.

10.  After the monitored telephone conversation between Boyce and Arthur, Agent Delia physically observed Boyce meet with Arthur for a very short period of time.  From his position and distance from their meeting, Agent Delia did not see any drugs or money exchanged, although from his training and experience he believed the circumstances of this meeting were consistent with it being a drug transaction.  After she met with Arthur, the monitoring agents overheard Boyce telephone Taylor and tell her she was on her way.  DEA agents followed Boyce as she drove toward the 5900 block of Kennerly, where Taylor lived.  The police did not follow Arthur.

---

[4]From their training and experience, the monitoring agents heard Boyce and Arthur use code words and phrases, such as "cook me a whole cake" for a full ounce of heroin and "$650" for one-half ounce of heroin,  to negotiate the drug deal.  Each of the monitoring agents determined what the code words meant; there was no generally used dictionary for discerning the meaning of the code words.  Although drug traffickers, generally, may use different code words for the same ideas, no evidence indicated that persons overheard in the subject wiretaps used different words for the same ideas and no evidence indicated that the agents in this case applied inconsistent meanings to the words they heard the subjects use.

11.  At that time, the surveilling agents contacted St. Louis Metropolitan Police Officer Martinous Walls and asked him to conduct a traffic stop of Boyce's vehicle and to investigate for the presence of controlled substances, if the circumstances allowed.  Officer Walls was to conduct the stop as he saw fit.  Officer Walls was then in uniform and in a marked police car.  He was given a description of the car Boyce was driving.  With Officer Walls in the marked police car were Officers Linden Cornell and Matthew Wiedeman.  These officers stationed themselves at the corner of Hodiamont and Locust, and watched Boyce approach that intersection.  They saw her drive through the stop sign there without stopping, which they knew was a violation of the traffic laws.  Officer Cornell, the driver, then activated the police car's emergency lights to stop Boyce's vehicle.  Boyce quickly pulled over and stopped.  From inside the police vehicle, Officer Walls saw Boyce make what he believed were furtive movements toward the front passenger side of her car.

12.  Officer Wiedeman got out of the police car and walked up to Boyce and ordered her to step out of the vehicle, which she did.  Sitting in the front passenger's seat was Boyce's juvenile granddaughter who was also directed to get out of the vehicle.  After she got out of the car, Boyce asked whether the officers' actions were necessary, she asked what she had done, she stated that all she had done was "bump the stop sign," and she again asked whether their actions were necessary.  Officer Wiedeman directed her and the child to move to a position near the rear of their vehicle and in front of the police vehicle.

13.  When Boyce was at the rear of her car, the police saw her reach into her granddaughter's pocket and remove an amber-colored prescription bottle.  The police officers then grabbed Boyce's arms, seized the bottle, and handcuffed her.  An officer then examined the contents of the bottle and saw that it contained several chunks of what looked like black tar heroin and an amount of china white heroin. Without being asked any question, while she was being handcuffed Boyce said, "Sir, I just felt so bad.  I could not leave that stuff in my grandbaby's pocket.  I am so sorry."

14.  At this time, Officer Cornell advised Boyce of her constitutional rights to remain silent and to counsel.  He asked her

whether she understood her rights and she answered in the affirmative. The police did not make any threat or promise to Boyce, and Boyce appeared lucid and coherent. Next, and while standing between her car and the patrol car, without being questioned, Boyce stated that she had a "20-year back-up," and, if her probation officer found out, she would be "lost."

15. Next, the officers placed Boyce in the back of the police car. As the officers were conducting their investigation, Officer Weideman saw the police car rocking. He opened the back door and removed a four-inch piece of aluminum foil from the rear of Boyce's pants. It appeared to the police that she had been attempting to remove the object from her person and shove it into the car seat. The foil was found to contain a plastic bag with two large chunks of what appeared to be black tar heroin. With this new discovery, Officer Cornell told Boyce she was now being charged with trafficking in drugs second degree--and not simple possession. Boyce then stated, without being questioned, "Please, sir, I can get you the biggest dealers in the city. You gotta help me. If I get arrested for this I'm gone for life."

16. Approximately an hour after Boyce's arrest on April 4, Task Force Agents Delia and Michael Sisco met with and interviewed Denise Boyce at the St. Louis City Justice Center where she was incarcerated. The agents introduced themselves as narcotics officers. Agent Sisco advised Boyce of her constitutional rights to remain silent and to counsel by reading them to her from a card. Boyce said she understood her rights and agreed to answer their questions. Boyce asked what they could do for her in exchange for her cooperation. The agents told her that they had no authority to make any promise or deal. They would only report what she said to the prosecutor. Boyce then answered their questions and provided very specific information about her and others' activities.[5] At no time did Boyce appear to be drunk or intoxicated by any substance. She appeared to understand what was said to her. No threat or promise was made to her, and no physical intimidation was used

---

[5]Defendant Boyce's statements are documented in Agent Delia's Report of Investigation dated April 5, 2005.

to get her to make any statement.  Boyce was issued a traffic citation for not stopping for the stop sign.

17.  Some time after April 4, 2005, after Boyce was released from custody, Officer Walls and DEA Agent William Keeney by chance encountered Boyce at a location on Shaw Ave. in St. Louis.  She was not in custody and their contact had not been planned.  Agent Keeney asked Boyce whether she would be interested in cooperating with the police.  Boyce declined.[6]


**April 18, 2007**

18.  On April 12, 2007, the indictment in this case was filed against Curtis Arthur, Denise Boyce, and Linda Taylor, and an arrest warrant was issued for each defendant.  Curtis Arthur was arrested on April 17, 2007.

19.  On April 18, DEA Agent Sisco and Immigration and Customs Enforcement Special Agent Todd Ostrum interviewed Arthur in the DEA office in St. Louis.  After identifying themselves, Agent Sisco read Arthur his <u>Miranda</u> rights from a field card.  Arthur said he understood his rights.  Next, the agents played several recorded conversations acquired from Title III wire-taps.  The agents asked Arthur if he recognized his voice in any of the recordings.  He responded that a speaker sounded like his voice.  The agents asked if he would like to talk any more about the investigation.  After a pause, Arthur said, "No." There was no more conversation and the agents then left the room.  In all, the meeting took no more than five minutes.  At no time during the April 18 interview was Arthur handcuffed nor did any agent make any threat or promise to induce him to cooperate or to make a statement.


## DISCUSSION

### I.  ELECTRONIC EVIDENCE

Defendants Curtis Arthur and Denise Boyce argue that the evidence acquired by the electronic surveillance and monitoring, i.e., the

---

[6]At the hearing held on June 15, 2007, counsel for the United States stated that the government did not intend to offer evidence of this encounter in its case-in-chief at trial.

wiretapping,[7] the pen register and trap and trace devices,[8] and the production of telecommunications data from the third party service providers[9] should be suppressed. More specifically they argue (1) the government failed to show the issuing judges that there was a need for the wiretapping because the usual investigative techniques had been attempted and failed; (2) the orders issued by the court were not sufficiently specific to identify the facilities to be intercepted; (3) the government's wiretapping was not properly minimized as required by the court's orders and by Title III; and (4) the wiretapping applications did not particularly describe the types of communications to be intercepted.

For the reasons set forth below, the undersigned disagrees with the defendants' arguments.

### 1. Pen Register and Trap and Trace Devices

On January 11 and February 2, the court issued orders pursuant to 18 U.S.C. § 3123, authorizing the installation of pen register and trap and trace devices, including enhanced caller identification devices, to register the numbers pulsed or dialed to and from several of the phone numbers under investigation. See Findings 3, 4(a), 5. The orders were based on the prosecutor's certifications that the information sought was relevant to the ongoing criminal investigation. The subject orders complied with the requirements of the law. 18 U.S.C. § 3123(b).

### 2. Telecommunications Data from Service Providers

On February 2 and March 31, 2005, the court issued orders pursuant to 18 U.S.C. § 2703(c) and (d) for disclosure, from third party

---

[7]Title III of the Omnibus Crime Control and Safe Streets Act of 1968, 18 U.S.C. §§ 2510-2520.

[8]The use of pen register and trap and trace devices is authorized by 18 U.S.C. § 3121-3127.

[9]The court issued orders that the provider of electronic communications service disclose certain information about the use of telephone number 314-420-6798 to the government pursuant to 18 U.S.C. § 2703(c) and (d).

providers, of telecommunications records, including cell site activation data for telephone numbers under investigation. <u>See</u> Findings 4(b), (d). The orders were properly issued upon applications that provided specific and articulable facts that demonstrated reasonable grounds to believe that the contents of communications over these telephone numbers would be relevant and material to an ongoing criminal investigation. 18 U.S.C. § 2703(d).

### 3. Wiretaps
#### a. General principles

A federal judge may issue an order authorizing or approving the interception of wire or oral communications upon a proper application of the United States. 18 U.S.C. § 2516(1). The judge may issue the order if the judge determines that (1) there is probable cause to believe that an individual is committing, has committed, or is about to commit one of the crimes described in 18 U.S.C. § 2516; (2) there is probable cause to believe that particular communications concerning the offense will be obtained through such interception; (3) normal investigative procedures have been tried and have failed or reasonably appear to be unlikely to succeed if tried or to be too dangerous; and (4) there is probable cause to believe that the facilities or the place from which the communications are to be intercepted are being used, or are about to be used, in connection with the commission of the offense, or are connected with the subject individual. 18 U.S.C. § 2518(3)(a)-(d); <u>United States v. Milton</u>, 153 F.3d 891, 895 (8th Cir. 1998).

A party challenging the validity of a federal wiretap order must show a substantial, not just technical, deviation from the requirements of the statute. <u>United States v. Fairchild</u>, 189 F.3d 769, 774-75 (8th Cir. 1999).

#### b. Specificity of the court orders

Defendants argue that the wiretap orders issued by the court were not sufficiently specific to identify the facilities and types of communications to be intercepted. The undersigned disagrees. Title III requires that a government application and any issued wiretap order

describe with particularity the nature and the location of the communication facilities involved in the wiretap and also the particular description of the types of communications sought to be intercepted. 18 U.S.C. § 2518(1)(b) & (4)(b), (c). In this case the applications stated and the issuing judges found that the government expected to hear evidence in the wiretaps of the specific telephone numbers about the drug trafficking and money laundering under investigation. This specificity complied with the law. <u>United States v. Nguyen</u>, 46 F.3d 781, 782 (8th Cir. 1995).

### c. Necessity for the wiretapping

Defendants argue that the affidavits of Agent Delia failed to prove that other investigative procedures have been tried and failed or appeared unlikely to succeed, if tried, or to be too dangerous to justify the use of wiretapping. 18 U.S.C. § 2518(1)(c). The undersigned disagrees. The affidavits submitted to the district judges described the law enforcement objectives of the investigation, which were reasonable. The affidavits also demonstrated that other-than-wiretap investigative techniques were used, had been helpful in the investigation, and were used during the wiretapping. However, the government is entitled to determine for itself the objectives of the investigation and to apply for wiretapping authority when other investigative techniques are insufficient to fully accomplish the investigative objectives. Each of the non-wiretap techniques used were inherently limiting; they were shown to not disclose the scope of evidence of criminal activity that Title III wiretaps can disclose. The close association of the drug traffickers and their extreme sensitivity to surveillance render other law enforcement investigative efforts reasonably unable to fully investigate them. Physical surveillance, pen registers, and telephone toll records of the persons investigated neither indicate the content of conversations nor obtain evidence of the alleged crimes. The undersigned concludes that the agent's affidavits proved the inadequacy of other, usual investigative procedures. <u>United States v. Agrusa</u>, 541 F.2d 690, 694 (8th Cir. 1976).

###### d.  Minimization of intercepted conversations

Defendants argue that the government did not properly minimize the interception of conversations.  The undersigned disagrees.  Title III requires the monitoring agents to minimize the interception of communications to those that are the proper subjects of the investigation.  18 U.S.C. § 2518(5); United States v. Padilla-Pena, 129 F.3d 457, 461-64 (8th Cir. 1997).  As set forth above, the government's factual affidavits, the district judges' authorization orders, the prosecutor's letters to the monitoring agents, and the ten-day reports all indicate that the monitoring agents complied with the minimization requirement.  No evidence indicated the contrary.

For these reasons, the motions to suppress the electronic evidence, including the defendants' recorded conversations, should be denied.

###### II.  PHYSICAL EVIDENCE AND STATEMENTS OBTAINED FROM DEFENDANT BOYCE ON APRIL 4, 2005

Defendant Boyce has moved to suppress the physical evidence seized from her on April 4, 2005, and her statements on that day.  The motion should be denied.

First, defendant Boyce was lawfully arrested without a warrant.  Probable cause to arrest without a warrant exists when the police have information sufficient to cause a reasonable person to believe that the defendant had committed an offense or was then committing an offense.  Beck v. Ohio, 379 U.S. 89, 91 (1964).  In this case, the drug agents monitored telephone conversations between Boyce and Arthur and between Boyce and Linda Taylor, which reasonably indicated that Boyce would purchase an ounce of black tar heroin from Arthur and sell it to Taylor, and the agents also observed Boyce as she met with Arthur and then set out to meet with Taylor.  A reasonable person would believe that Boyce then was engaged in illegal drug trafficking.

Rather than arrest Boyce immediately, the agents determined to have a uniformed police officer perform a lawful traffic stop of Boyce as she was en route to meet with prospective heroin buyer Taylor.  The traffic stop was lawful.  An officer who observes a traffic violation, even a

minor one, has probable cause to initiate a traffic stop.  United States v. Linkous, 285 F.3d 716, 719 (8th Cir. 2002).  Once the officer makes the traffic stop, the officer may lawfully check the driver's license and registration, ask the driver about her destination and purpose, and request that the driver sit inside the patrol car.  United States v. Bloomfield, 40 F.3d 910, 915 (8th Cir. 1994) (en banc).  In this case, Officer Walls observed defendant Boyce drive her automobile through an intersection without stopping at a stop sign.  This act authorized the traffic stop and the direction to Boyce that she and her granddaughter exit their vehicle.

Soon thereafter, the actions and statements of Boyce provided information that further warranted her warrantless arrest.  See United States v. Jones, 269 F.3d 919, 925 (8th Cir. 2001).  Consistent with the observed furtive movements inside her vehicle upon being pulled over by Officer Walls, Boyce removed a plastic container from her granddaughter's person.  Her spontaneous statements, see Findings 12 and 13 above, added criminal context to her actions.  The police seizure of the plastic bottle Boyce took from her granddaughter and the seizure of the plastic bag from Boyce in the back of the police car, both without a warrant, were lawful as incident to her lawful arrest.  New York v. Belton, 453 U.S. 454, 461 (1981).

Therefore, the physical evidence seized from defendant Boyce on April 4, 2005, should not be suppressed.

Defendant Boyce's statements made on April 4, 2005, should not be suppressed.  The government has the burden of establishing the constitutional admissibility of a defendant's statements by a preponderance of the evidence.  Colorado v. Connelly, 479 U.S. 157, 169 (1986).  The admissibility of defendant's statements depends upon whether her statements were constitutionally voluntary, id. at 163-67; and, when the statements were made during police interrogation while the defendant was in custody, whether the defendant had been advised of her rights, as prescribed by Miranda v. Arizona, 384 U.S. 436 (1966), and, if so, whether the defendant knowingly and voluntarily waived the Miranda rights, North Carolina v. Butler, 441 U.S. 369, 373, 375-76 (1979).  The admissibility of statements does not require that they be preceded by an

advise of rights, if the person who made the statements was not in custody or not the subject of interrogation when the statements were made. <u>Miranda</u>, 384 U.S. at 444-45, 467-68, 478. And the statements' admissibility does not require <u>Miranda</u> rights, if the suspect's statements were made spontaneously, not in response to police interrogation. <u>See</u> <u>United States v. Menteer</u>, 350 F.3d 767, 770 (8th Cir. 2003), <u>cert. granted</u>, <u>judgment vacated by</u> 544 U.S. 916 (2005), <u>opinion reinstated by</u> 408 F.3d 445 (8th Cir. 2005); <u>United States v. Hawkins</u>, 102 F.3d 973, 975 (8th Cir. 1996).

Statements are constitutionally involuntary if they are the result of government overreaching, such as mental or physical coercion, deception, or intimidation. <u>Connelly</u>, 479 U.S. at 169-70; <u>Moran v. Burbine</u>, 475 U.S. 412, 421 (1986); <u>United States v. Jordan</u>, 150 F.3d 895, 898 (8th Cir. 1998); <u>United States v. Goudreau</u>, 854 F.2d 1097, 1099 (8th Cir. 1988). Regardless of the mental condition of the defendant, statements are not constitutionally involuntary without improper government action. <u>See</u> <u>Connelly</u>, 479 U.S. at 169-70; <u>Goudreau</u>, 854 F.2d at 1099.

None of defendant Boyce's statements on April 4 were involuntary. No evidence indicated any overbearing actions or overreaching on the part of the police to induce her to make her statements. At the scene of the traffic stop she was motivated by remorse for involving her granddaughter in her illegal activity and her anxiety over the prospect of returning to prison.

Further, none of her statements at the scene of the traffic stop, both standing outside and when she was inside the police car, were made in response to interrogation. They were all made spontaneously.

The statements she made later on April 4 in the police station were voluntary and were made after she had twice been advised of her <u>Miranda</u> rights (at the scene of the traffic stop and in the agents' police station interview) and after she expressly waived them.

Her statements and the items seized from her should not be suppressed.

III.  STATEMENTS OBTAINED FROM DEFENDANT ARTHUR ON APRIL 18, 2007

The statements defendant Arthur made in custody on April 18, 2007, in response to the agents' questions should not be suppressed.  Arthur made the statement after being advised of his <u>Miranda</u> rights and after implicitly waiving them.  <u>Butler</u>, 441 U.S. at 373; <u>Thai v. Mapes</u>, 412 F.3d 970, 977 (8th Cir.)(implied waiver of <u>Miranda</u> rights demonstrated by voluntariness of statements, subject's failure to show that he did not understand his rights, and his repeated statements that he understood them), <u>cert. denied</u>, 126 S. Ct. 746 (2005).  In Arthur's case, he was expressly advised of his rights, he expressly stated he understood them, and, after stating the recorded voice he heard sounded like his, he expressly asserted his right to remain silent.  Thereafter, no questions were asked of him and he made no further statement.  Upon this record, the undersigned concludes that defendant Arthur waived his <u>Miranda</u> rights before he made his statement.

Whereupon,

**IT IS HEREBY ORDERED** that the oral motions of the government for a hearing (Docs. 22 and 53) are denied as moot.

**IT IS HEREBY RECOMMENDED** that the motions of defendant Curtis Arthur to suppress evidence (oral motion Doc. 21), to suppress evidence and statements (Doc. 82), and to suppress the fruits of illegal electronic and other surveillance (Doc. 83) be denied.

**IT IS FURTHER RECOMMENDED** that the motions of defendant Denise Boyce to suppress evidence (oral motion Doc. 52), to suppress evidence and statements (Doc. 79), and to suppress the contents of any electronic surveillance (Doc. 80) be denied.

The parties are advised they have ten days to file written objections to this Order and Recommendation.  The failure to file objections will result in a waiver of the right to appeal issues of fact.

## ORDER SETTING TRIAL DATE

As directed by the District Judge, this matter is set for a jury trial on the docket commencing September 4, 2007, at 9:00 a.m.

_____/S/  David D. Noce_____
**DAVID D. NOCE**
**UNITED STATES MAGISTRATE JUDGE**

Signed on July 5, 2007.